# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 18, 2014        Decided July 18, 2014

No. 13-5081

ARIANA KLAY, ET AL.,
APPELLANTS

v.

LEON E. PANETTA, FORMER SECRETARY OF DEFENSE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00350)

*Susan L. Burke* argued the cause and filed the brief for appellants.

*Lowell V. Sturgill Jr.*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Barbara L. Herwig*, Attorney.

Before: ROGERS, GRIFFITH, and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Concurring Opinion filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Plaintiffs are current or former members of the United States Navy and Marine Corps who allege that they were raped, sexually assaulted, or sexually harassed by their fellow Sailors and Marines, only to suffer retaliation from their superiors for reporting their plight. Their appeal is both difficult and easy. Difficult, because it involves shocking allegations that members of this nation's armed forces who put themselves at risk to protect our liberties were abused in such a vile and callous manner. Easy, because plaintiffs seek relief under a legal theory that is patently deficient.

Plaintiffs have not sued their attackers or those who retaliated against them for reporting their abuse. Rather, plaintiffs have sought money damages directly under the Constitution from senior officials in the military and Department of Defense who, plaintiffs allege, could have put in place policies to prevent their injuries but failed to do so. The Supreme Court has held that military officials are not subject to personal liability under the Constitution for their management decisions, including the choices they make about the discipline, supervision, and control of servicemembers. Because adjudication of plaintiffs' claims would require judicial intrusion upon such military matters, we affirm the district court's dismissal of their suit.

I

Because this appeal arises from the defendants' successful motion to dismiss, we presume the allegations in the complaint are true and view the facts in the light most favorable to plaintiffs. *See Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir. 2014).

Plaintiffs are twelve current and former sailors and Marines. During their service, eleven were either raped or sexually assaulted by fellow members of the armed forces. One was the target of severe sexual harassment by Marines and a fellow Navy Corpsman with whom she deployed. The attacks and harassment left plaintiffs with a range of serious physical and psychological injuries. In each case the injury was compounded by the retaliation plaintiffs suffered when they reported what had happened to their superiors.

Though the experience of each plaintiff is unique, that of Janet Galla provides an example of the kind of harm plaintiffs endured. *See* First Am. Compl. ¶¶ 144-164. Galla served in the Navy from 1999 to 2005 as a Hospital Corpsman. On June 11, 2004, after having dinner with a group of friends, Galla returned to her ship. While she was checking her email in the ship's Medical Department, a fellow Corpsman asked if he could show her something in one of the Department's operating rooms. She followed him into an operating room, where he tried to kiss her. She resisted, asked him to stop, and tried to leave the room, but he prevented her from escaping, then raped her. Galla immediately reported the rape. Although her attacker was ultimately convicted and sent to prison, Galla faced retaliation from her chain of command. She was not allowed to work in enclosed spaces with male colleagues, a restriction her superiors claimed was for her own protection. This limitation not only made it difficult for her to do her job, but left her feeling ostracized from her shipmates. Galla began to receive negative performance evaluations and was eventually told by her commander that it would be best for "morale" if she left the ship. She transferred to a duty station on land, but the retaliation continued when her new chain of command learned about the rape and the ongoing investigation. Suffering from post-traumatic stress disorder, Galla was singled out for drug and alcohol tests and was

accused of using her rape as an excuse for poor job performance. One member of her new command told her that the rape was only "five minutes of her life" and she needed to "get over it already." In the face of such harassment and ostracism, Galla accepted her superiors' offer of immediate separation from the Navy in 2005.

In 2012, Galla and the other plaintiffs filed suit in the district court against nine defendants: the three most recent Secretaries of Defense, Secretaries of the Navy, and Commandants of the Marine Corps. *Id.* ¶¶ 181-189. Plaintiffs alleged that their injuries resulted from the acts and omissions of these defendants who were fully aware of the prevalence of sexual misconduct and retaliation in the Navy and Marine Corps, had the power to eliminate it, and yet failed to take effective steps to do so. *See id.* ¶¶ 190-206. Plaintiffs identified a variety of practices the defendants allegedly authorized or oversaw that contributed to this hostile environment. For instance, the defendants granted "moral waivers" that let recruits with criminal convictions serve in the military; they allowed commanders to interfere with the impartiality of criminal investigations into sexual assaults; and they permitted perpetrators to receive nonjudicial punishment and to be honorably discharged. *See id.* ¶¶ 200, 207-222. In addition, plaintiffs alleged that the three defendant Secretaries of Defense flatly ignored statutory mandates from Congress requiring the establishment of a commission to investigate the military's treatment of sexual misconduct allegations and the creation of a centralized database of sexual assault incidents. *See id.* ¶¶ 216-217, 219, 222.

Plaintiffs did not, however, claim that this alleged misconduct ran afoul of any federal statute that would authorize them to recover damages from the defendants.

Instead, plaintiffs argued that the defendants' actions and inactions violated a variety of plaintiffs' constitutional rights: Fifth Amendment rights to bodily integrity, due process, and equal protection; a First Amendment right to speak about their assaults without retaliation; and a Seventh Amendment right to have juries try their assailants. *See id.* ¶¶ 223-240. Citing *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), plaintiffs argued that the cause of action for damages they sought could be implied directly under these constitutional provisions. *See* First Am. Compl. ¶ 2.

The defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and the district court granted their motion. *Klay v. Panetta*, 924 F. Supp. 2d 8 (D.D.C. 2013). Acknowledging that the "factual recitations . . . describe brutal and criminal assaults, compounded by a degrading and humiliating institutional response," the court nonetheless concluded that it lacked "the power to provide the particular sort of remedy sought here for the specific injustices alleged in the complaint." *Id.* at 12. According to the district court, plaintiffs' suit for damages under *Bivens* was foreclosed by Supreme Court precedent disallowing such a remedy "'for injuries that arise out of or are in the course of activity incident to [military] service.'" *Id.* at 13 (quoting *United States v. Stanley*, 483 U.S. 669, 684 (1987)).

Plaintiffs appealed. We have jurisdiction under 28 U.S.C. § 1291 and review the district court's dismissal de novo. *Autor*, 740 F.3d at 179.

II

Plaintiffs' theory of liability is based upon the Supreme Court's decision in *Bivens*, which recognized an implied private cause of action for damages against federal officials who violate the Fourth Amendment. 403 U.S. at 395-97. But while *Bivens* could have ushered in a new era of broad constitutional tort liability, history has taken a different course. Only twice has the Supreme Court approved the application of *Bivens*'s reasoning to new classes of cases, and never in the past thirty years. *See Davis v. Passman*, 442 U.S. 228, 230-31, 234 (1979) (congressional employee's employment discrimination claim under the Fifth Amendment); *Carlson v. Green*, 446 U.S. 14, 18-23 (1980) (prisoner's cruel and unusual punishment claim against prison officials under the Eighth Amendment). In numerous other cases, by contrast, the Court has found extension of *Bivens* unwarranted, *see Minneci v. Pollard*, 132 S. Ct. 617, 622-23 (2012) (collecting cases), expressing its "reluctan[ce] to extend *Bivens* liability to 'to any new context or new category of defendants,'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) (quoting *Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 68 (2001)); *see also Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (noting that "in most instances we have found a *Bivens* remedy unjustified"). This unwillingness to extend *Bivens* derives from the Court's shift toward disfavoring judicially implied causes of action generally. *See Iqbal*, 129 S. Ct. at 1948; *see also Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.").

In recent years, the Court has prescribed a two-step approach for determining whether a *Bivens* remedy is available. First, a court should ask "whether any alternative, existing process for protecting the interest amounts to a

convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. "[E]ven in the absence of an alternative," however, "a *Bivens* remedy is a subject of judgment: 'the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.'" *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983)).

Assuming (without deciding) there is no alternative remedy here, we conclude plaintiffs' would-be *Bivens* action nonetheless fails at the second step of this analysis. As we will explain, both the military context of plaintiffs' claims and Congress's extensive legislation on this specific issue are special factors that counsel decisively against authorizing a *Bivens* remedy.[1]

A

The Supreme Court first addressed the availability of a *Bivens* action in the military context in *Chappell v. Wallace*, 462 U.S. 296 (1983), a case in which enlisted Navy sailors sued superior officers who had allegedly mistreated them on the basis of race. The Court held that the plaintiffs could not

---

[1] Given our conclusion that special factors preclude a *Bivens* remedy, we need not address whether plaintiffs have adequately alleged violations of the various constitutional provisions cited in their complaint. *See Ali v. Rumsfeld*, 649 F.3d 762, 772-74 (D.C. Cir. 2011) (declining to decide whether plaintiffs had adequately alleged constitutional violations where special factors independently foreclosed *Bivens* claims). For the same reason, we need not address whether the defendants are protected by qualified immunity.

seek damages under *Bivens* because "the unique disciplinary structure of the Military Establishment and Congress' activity in the field" were "special factors" that cut squarely against such liability. *Id.* at 304. "[T]he need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel," the Court explained, "would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are charged to command." *Id.* Moreover, Congress had "exercised its plenary constitutional authority over the military" to regulate military life and military justice in numerous respects, but notably had "not provided a damages remedy for claims by military personnel that constitutional rights have been violated by superior officers." *Id.* at 302, 304. For the judiciary to imply such a remedy would therefore "be plainly inconsistent with Congress' authority in this field." *Id.* at 304.

The Court clarified just how little room *Chappell* left for *Bivens* actions in the military context in *United States v. Stanley*, 483 U.S. 669 (1987). Stanley, a former soldier, alleged that the Army had surreptitiously given him doses of LSD to study its effects on humans. *Id.* at 671. Rejecting Stanley's argument that *Chappell* should be limited to suits by subordinates against superior officers in their direct chain of command, the Court ruled that he could not bring a *Bivens* action against the various federal officials involved in the testing, both military and civilian. *Id.* at 679-84. *Chappell*, the Court noted, had drawn support from a line of case law precluding liability under the Federal Tort Claims Act (FTCA) for injuries suffered in the course of military service. *Id.* at 681-82; *see also Feres v. United States*, 340 U.S. 135, 146 (1950) (establishing the military exception to the FTCA). Failing to see "any reason why our judgment in the *Bivens* context should be any less protective of military concerns than it has been with respect to FTCA suits," the Court

concluded that the same test should apply in both contexts. *Stanley*, 483 U.S. at 681. Accordingly, it held "that no *Bivens* remedy is available for injuries that 'arise out of or are in the course of activity incident to service.'" *Id.* at 684 (quoting *Feres*, 340 U.S. at 146).[2]

*Stanley* thus frames the central inquiry in this case: Did plaintiffs' injuries arise out of activity incident to service? Despite having been active-duty servicemembers at the time of the attacks and retaliation, plaintiffs contend that their injuries were not "incident to service." According to plaintiffs, "In order to fall within the scope of the 'incident to service [test],' the injury must actually arise from conduct done to further a military mission." Appellants' Br. 25. And, they say, it is inconceivable that they "were raped to advance a military mission." *Id.* at 27. The latter point is surely correct, but the former—for which plaintiffs tellingly offer no citation of supporting authority—is not, as *United States v. Shearer*, 473 U.S. 52 (1985), illustrates.

The plaintiff in *Shearer* was the mother of an Army private who, while off-duty and off-base, was kidnapped and murdered by another soldier. *Id.* at 53. Private Shearer's mother sued the United States under the FTCA, alleging that the Army had known that the murderer was dangerous and yet had negligently failed to exert proper control over him or to warn others of the danger he posed. *Id.* at 53-54. Although the murder of Private Shearer plainly did not advance any military mission, the Supreme Court nonetheless held the

---

[2] The Supreme Court did not itself apply this test to the facts of Stanley's suit. Instead, the Court noted that the Ninth Circuit had already decided "[t]he issue of service incidence" against Stanley in the course of dismissing the FTCA claim that he brought alongside his *Bivens* claim, and that that ruling was not properly before the Court. *See Stanley*, 483 U.S. at 680.

claim barred under the "incident to service" test. *See id.* at 57, 59. In so deciding, the key questions the Court asked were "whether the suit requires the civilian court to second-guess military decisions, and whether the suit might impair essential military discipline." *Id.* at 57 (citations omitted). Because the plaintiff's claim was framed in terms of the Army's failure to supervise and control the perpetrator, it "str[uck] at the core of these concerns." *Id.* at 58; *see also id.* ("This allegation goes directly to the 'management' of the military; it calls into question basic choices about the discipline, supervision, and control of a serviceman.").

*Shearer* reveals that in deciding whether an injury is "incident to service," a court cannot focus narrowly on the conduct that proximately caused the harm. Instead, the court must take a broader view and examine the plaintiff's theory of the case. If adjudicating the case would require military leaders to defend their professional management choices—"to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions," *id.*—then the claim is barred by the "incident to service" test. Or, as the Fourth Circuit recently put it in a case nearly identical to this one, "the 'incident to service' test asks, in relevant part, whether 'particular suits would call into question military discipline and decisionmaking [and would] require judicial inquiry into, and hence intrusion upon, military matters.'" *Cioca v. Rumsfeld*, 720 F.3d 505, 515 (4th Cir. 2013) (alteration in original) (quoting *Stanley*, 483 U.S. at 682).

The district court ably explained how this proper understanding of the test applies to plaintiffs' case:

Despite plaintiffs' efforts to characterize this case as a suit about rape and retaliation, that is not the basis of their legal claims. Plaintiffs have not sought damages

from any of the service members who allegedly raped or retaliated against them, and they do not allege that defendants personally participated in the alleged sexual assaults or retaliatory actions. Rather, by alleging that the wrongdoing arose out of a hostile climate created—or at least, not effectively addressed and therefore, tacitly sanctioned—by defendants, plaintiffs have asked the Court to review a decade's worth of military management decisions . . . .

*Klay*, 924 F. Supp. 2d at 18-19 (citations omitted). Plaintiffs' suit invites a civilian court to adjudicate, for example, whether it was proper for the defendants to permit felons to serve in the military, commanders to use nonjudicial punishment on offenders, offenders to be honorably discharged, and military (rather than civilian) authorities to investigate and prosecute sexual assaults. This is precisely the kind of "judicial inquiry into, and hence intrusion upon, military matters" that the Supreme Court disavowed in *Stanley*. 483 U.S. at 682.

## B

Plaintiffs contend that at least some of the misconduct they allege falls outside the logic of *Stanley* and *Shearer*: namely, that the defendant Secretaries of Defense ignored congressional mandates requiring the creation of a commission to examine the military's procedures for investigating allegations of sexual misconduct and the establishment of a centralized database of reported sexual assaults in the military. Plaintiffs argue that adjudicating this aspect of their suit would not entail impermissible judicial intrusion upon the management of the military because military leaders simply have no authority to violate statutory directives. The court would not, in other words, be requiring

the defendants "to convince a civilian court of the wisdom" of their decision, *Shearer*, 473 U.S. at 58, because no amount of military wisdom can justify ignoring a valid congressional mandate. Even if plaintiffs' reasoning about the limits of *Stanley* and *Shearer* has some force, we conclude nonetheless that authorizing this *Bivens* action would be inappropriate.

As we noted above, one of the special factors underlying *Chappell*'s holding was "Congress' activity in the field." 462 U.S. at 304. If Congress has legislated pervasively on a particular topic but has not authorized the sort of suit that a plaintiff seeks to bring under *Bivens*, respect for the separation of powers demands that courts hesitate to imply a remedy. *See id.* at 302-04; *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) ("[T]he concept of special factors . . . has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent." (internal quotation marks omitted)). Thus, in *Doe v. Rumsfeld*, this court's conclusion that the plaintiff could not seek a *Bivens* remedy for alleged mistreatment while in military detention rested in part on the fact that recent relevant legislation, the Detainee Treatment Act of 2005, did not create a cause of action for injured detainees. *See* 683 F.3d 390, 396-97 (D.C. Cir. 2012); *see also Vance v. Rumsfeld*, 701 F.3d 193, 200-01 (7th Cir. 2012) (en banc) (similar); *Lebron v. Rumsfeld*, 670 F.3d 540, 551-52 (4th Cir. 2012) (similar).

The same separation-of-powers principle applies here. Congress has been "no idle bystander to th[e] debate" about sexual assault in the military. *Lebron*, 670 F.3d at 551. The four most recent National Defense Authorization Acts have each included numerous provisions aimed at combating this scourge. *See* Pub. L. No. 113-66, §§ 1701-1753, 127 Stat. 672, 950-85 (2013); Pub. L. No. 112-239, §§ 570-579, 126

Stat. 1632, 1752-64 (2013); Pub. L. No. 112-81, §§ 581-586, 125 Stat. 1298, 1430-36 (2011); Pub. L. No. 111-383, §§ 1601-1632, 124 Stat. 4137, 4429-36 (2011). The Consolidated Appropriations Act of 2014 appropriated $25 million for the Department of Defense to implement a Sexual Assault Special Victims Program. *See* Pub. L. No. 113-76, §§ 8124-8125, 128 Stat. 5, 133-34 (2014). And Congress is currently debating further legislation on the issue. *See* Victims Protection Act of 2014, S. 1917, 113th Cong. (2014); Ed O'Keefe, *Senate Easily Passes McCaskill's Military Sexual Assault Bill*, WASH. POST, 2014 WLNR 6542224 (Mar. 10, 2014). Crucially, none of these statutes—nor those the defendants allegedly violated—authorizes a damages action against the defendants. *Cf. Vance*, 701 F.3d at 201 ("These statutes have one thing in common: *none* provides for damages against military personnel or their civilian superiors."). Given that Congress is extensively engaged with the problem of sexual assault in the military but has chosen not to create such a cause of action, we decline to imply a *Bivens* remedy here, even in the face of plaintiffs' allegations of statutory violations.

Plaintiffs flip this separation-of-powers logic on its head, contending that respect for Congress *requires* us to adjudicate their claims. "[I]f the judiciary refuses to adjudicate any claims alleging that the military ignored Congressional mandates, the military enjoys the very type of power not subject to checks and balances that the drafters of the Constitution feared." Appellants' Br. 14. But our decision that a *Bivens* action will not lie here hardly puts the military beyond the reach of Congress. Plaintiffs are forced to rely on *Bivens* because Congress *has not* authorized a cause of action against these defendants for this alleged misconduct, not because Congress *cannot*. Congress remains free to authorize a damages action of the sort plaintiffs wish to pursue; if it

does, courts will be duty-bound to adjudicate those claims. And contrary to plaintiffs' counsel's suggestion at oral argument, *see* Oral Arg. Recording at 2:50-3:05, Congress could even permit plaintiffs to sue in connection with their past injuries. *See INS v. St. Cyr*, 533 U.S. 289, 316 (2001) ("[I]t is beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect."); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (contemplating statutes that "increase a party's liability for past conduct"). Far from requiring us to recognize a *Bivens* remedy here, the separation of powers supports our determination not to. *See Stanley*, 483 U.S. at 682 ("[T]he insistence . . . with which the Constitution confers authority over the Army, Navy, and militia upon the political branches . . . counsels hesitation in our creation of damages remedies in this field.").

III

In affirming the district court's dismissal, we do not take lightly the severity of plaintiffs' suffering or the harm done by sexual assault and retaliation in our military. But the existence of grievous wrongs does not free the judiciary to authorize any and all suits that might seem just. Our authority to permit *Bivens* actions is narrow to start, and narrower in the military context. We therefore join the Fourth Circuit in concluding that no *Bivens* remedy is available here. *See Cioca v. Rumsfeld*, 720 F.3d 505 (4th Cir. 2013). The judgment of the district court is affirmed.

1

GRIFFITH, *Circuit Judge,* concurring: I write separately to address one of plaintiffs' allegations that I believe warrants brief discussion. Although we must generally assume the truth of plaintiffs' allegations given the procedural posture of this case, we need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004); *see also Earle v. District of Columbia*, 707 F.3d 299, 308 n.10 (D.C. Cir. 2012) (recognizing that "we may take judicial notice of statutes"). Among other things, plaintiffs allege that defendant Donald Rumsfeld "ignor[ed] Public Law 105-85, which required the Secretary of Defense to establish a commission to investigate policies and procedures with respect to the military investigation of reports of sexual misconduct. Defendant Rumsfeld . . . failed to appoint any members of the commission." First Am. Compl. ¶ 219.

Public Law 105-85 was the National Defense Authorization Act for Fiscal Year 1998, passed more than three years before Rumsfeld became Secretary of Defense. *See* Pub. L. No. 105-85, 111 Stat. 1629 (1997); First Am. Compl. ¶ 183. Although the act could in theory have imposed duties that eventually fell on Rumsfeld, I am unable to locate any provision that meets the complaint's description of the obligation allegedly violated. (A more precise citation would have been useful: Public Law 105-85 is 450 pages long.) The provision that comes closest to fitting the complaint's description did not require the establishment (or staffing) of a commission, but instead required the Secretary of Defense to procure within one year, from a specified nonprofit organization (the National Academy of Public Administration), an "independent study of the policies, procedures, and practices of the military criminal investigative organizations for the conduct of investigations

2

of complaints of sex crimes and other criminal sexual misconduct arising in the Armed Forces." Pub. L. No. 105-85, § 1072, 111 Stat. at 1898-99. Then-Secretary of Defense William Cohen appears to have complied fully with this directive. *See* NAT'L ACAD. OF PUB. ADMIN., ADAPTING MILITARY SEX CRIME INVESTIGATIONS TO CHANGING TIMES (1999) (resulting report). It is no small thing to allege that the Secretary of Defense ignored an act of Congress, and I am troubled by the possibility that plaintiffs' counsel leveled this charge without first carefully reading the act in question.